**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

-----------------------------------------------------------x

BRUCE DAWSON and JOHN TAMBURINI
individually and on behalf of all others similarly
situated,

                       Plaintiffs,

       v.

GENERAL MOTORS LLC,

                   Defendant.

-----------------------------------------------------------x

No. _____

**COMPLAINT – CLASS ACTION**

**<u>JURY TRIAL DEMANDED</u>**

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION ................................................................................................ 1

II.  JURISDICTION AND VENUE ......................................................................................... 3

III.  PARTIES ............................................................................................................................ 4

IV.  CLASS ACTION ALLEGATIONS ................................................................................ 10

V.  STATUTES OF LIMITATION ...................................................................................... 12

VI.  ADDITIONAL FACTUAL ALLEGATIONS ................................................................ 14

CAUSES OF ACTION ............................................................................................................. 26

COUNT I ................................................................................................................................... 26

COUNT II .................................................................................................................................. 29

COUNT III ................................................................................................................................ 30

COUNT IV ................................................................................................................................ 32

COUNT V .................................................................................................................................. 34

VII.  REQUEST FOR RELIEF ............................................................................................... 35

VIII. DEMAND FOR JURY TRIAL ...................................................................................... 36

Plaintiffs Bruce Dawson and John Tamborini ("Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against General Motors LLC ("Defendant" or "GM"), based where applicable on personal knowledge, information and belief, and the investigation of counsel.

## I.     NATURE OF THE ACTION

1.     This class action concerns diesel vehicles sold in New Jersey with CP4 fuel injection pumps. Specifically, the vehicles at issue refer to GM manufactured vehicles, including, but not limited to the following: the 2011-2016 model year Chevrolet Silverado 2500 and 3500 and the 2011-2016 model year GMC Sierra 2500 and 3500, which are equipped with the 6.6 liter, V-8, turbocharged, Duramax engine (collectively, the "Class Vehicles").

2.     Diesel vehicles are generally known for their reliability and GM marketed and sold the Class Vehicles based on their purported dependability and fuel efficiency.

3.      GM, however, failed to disclose to Plaintiffs and other buyers/lessees that the Bosch CP4 high pressure fuel injection pumps installed in the Class Vehicles are defective when used in the United States.

4.     Specifically, such pumps, which require a certain amount of lubricity, are incompatible with U.S. diesel fuel, which does not have the required lubricity. This causes the pumps to fail catastrophically, sending metal shards throughout the entire fuel injection system and engine, which necessitates repairs costing anywhere from $7,000 to $20,000.  Moreover, the "repair" typically includes replacing the defective component – the Bosch CP4 pump – with the same defective component – another identical Bosch CP4 pump.

1

5.      This defect also poses a safety risk to the driver and passengers of the Class Vehicles because when the pump fails it often causes the vehicle to lose power and stall at high speeds, which exposes the driver and passengers to increased risk of accident, injury, or death.

6.      GM knew that the Class Vehicles were defective.  However, instead of alerting Plaintiffs and the members of the Class, it posted service bulletins to dealers – not consumers – and ultimately replaced the Bosch CP4 fuel injection pump with the HP4 fuel injection pump - supplied by Denso - beginning in the 2017 models of the vehicles at issue.  GM has continued to conceal the problems with the Bosch CP4 pump even after it stopped using the CP4 injection pump.  Defendant also failed to disclose that the defect would diminish the intrinsic and resale value of the Class Vehicles and lead to the safety concerns alleged herein.

7.      Many owners and lessees of the Class Vehicles have communicated with Defendant's agents to request that they remedy and/or address the resultant damage at no expenses, but Defendant has failed and/or refused to do so.  Moreover, GM often blames the consumer for the CP4 fuel pump failures by claiming that the problem is due to fuel contamination even though GM is aware that the CP4 fuel pumps are incompatible with all U.S. diesel fuel.

8.      Defendant has also refused to take any action to correct the defect and/or resultant damage when it manifests in the Class Vehicles outside of the warranty period.  Since the problem typically manifests within and/or shortly outside of the warranty period for the Class Vehicles – and given Defendant's knowledge of the problem – any attempt by Defendant to limit the warranty with respect to the defect is unconscionable.

9.      Plaintiffs are consumers who were hoodwinked into purchasing these vehicles. As a result of Defendant's unfair, deceptive and/or fraudulent business practices, owners and/or

lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value.

10.     Plaintiffs would not have purchased these vehicles and/or would have paid less for such vehicles had GM revealed the defect.  Plaintiffs have also paid thousands of dollars to repair the vehicles when the pumps failed.

11.     Plaintiffs bring this suit on behalf of a proposed class of similarly situated consumers.  They assert that GM has violated established New Jersey state consumer protection laws, breached express and implied warranties, and unjustly enriched itself to the detriment of Plaintiffs and the Class.  Plaintiffs seek damages and equitable relief on behalf of themselves and the proposed Class.

## II.     <u>JURISDICTION AND VENUE</u>

12.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one member of the proposed class is of diverse citizenship from one defendant, there are more than 100 class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

13.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

14.     This Court has personal jurisdiction over Defendant because it conducts business in New Jersey, and has sufficient minimum contacts with New Jersey.

15.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and because Defendant has caused harm to class members residing in this District.

III.   **PARTIES**

16.    Plaintiff Bruce Dawson ("Dawson") is a citizen of the State of New Jersey and is domiciled in Ship Bottom, New Jersey. In October 2010, Dawson purchased a new 2011 GMC Sierra 3500 pickup truck from an authorized GM dealership located in Manahawkin, New Jersey for approximately $51,521. Dawson used this as both his personal vehicle and for his business, Dawson's Boat Hauling. In the fall of 2013, the Bosch CP4 fuel pump in Dawson's vehicle experienced a catastrophic failure while hauling a boat on a trailer in Charlottesville, Virginia. At the time, Dawson's truck had approximately 165,000 miles. As a result of this breakdown, Dawson was forced to pay a third party $800 to complete this boat transport job. Defendants did not reimburse Dawson for such expenses. Moreover, Dawson lost the use of this truck for about 40 days, when damage due to the defective Bosch CP4 pump was being repaired.

17.    At the time Dawson purchased his 2011 GMC Sierra 3500, and in purchasing the vehicle, Dawson relied on representations from GM and its authorized dealership that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Dawson relied on these representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, caused Dawson to purchase the vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Dawson, at the time of purchase, the 2011 GMC Sierra 3500 contained a defective CP4 fuel injection system that was not suitable for American vehicles and which

4

deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Dawson relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Dawson or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Dawson and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects.

18.     In April 2015, Dawson purchased a 2016 GMC Sierra 3500 pickup truck, VIN: 1GT42XE83GF188510, from an authorized GM dealership located in Manahawkin, New Jersey for approximately $60,071.  Dawson used this as both his personal vehicle and for his business, Dawson's Boat Hauling. In the fall of 2017, the Bosch CP4 fuel pump in Dawson's vehicle experienced a catastrophic failure while hauling a boat on a trailer in Dade City, Florida. Although Dawson brought the truck to an authorized GM dealership for repairs, the repair was not done properly. Moreover, Dawson lost the use of his truck and the trailer it was towing for more than 40 days. Dawson was required to pay a third party to tow his trailer back to New Jersey – an expense that was never reimbursed by GM. Although GM provided Dawson with a rental car to get home from Florida, GM failed to provide a replacement truck during the time when his vehicle was out of service. As a result, Dawson was forced to turn down boat hauling jobs that he would have accepted normally if he had the use of this vehicle. Dawson continued using the 2016 GMC Sierra until 2018, when he sold it with 180,000 miles.

19.     At the time Dawson purchased his 2016 GMC Sierra 3500, and in purchasing the vehicle, Dawson relied on representations from GM and its authorized dealership that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Dawson relied on these representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, caused Dawson to purchase the vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Dawson, at the time of purchase, the 2016 GMC Sierra 3500 contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Dawson relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Dawson or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Dawson and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects.

20.     Dawson's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase,

decreased performance of the vehicles, and diminished value of the vehicles. Accordingly, Dawson brings claims individually and as a representative of the Class.

21.     Plaintiff John Tamburini ("Tamburini") is a citizen of the State of New Jersey and is domiciled in Hillsborough, New Jersey. On August 25, 2015, Tamburini purchased and took delivery of a new 2015 GMC Sierra 2500 pickup truck (Vin: 1GT12YE85FF545404) from Barlow Buick GMC, an authorized GM dealership located in Manahawkin, New Jersey, and paid approximately $55,428.00.  Tamburini, who is a certified boat engine mechanic, used this vehicle as both his personal vehicle and for his business, On The Ramp Marine Trans LLC.

22.     On December 27, 2017, Tamburini's vehicle was driving on the New York State Thruway when the gas throttle pedal became hesitant and then nonresponsive and the vehicle lost its ability to accelerate. The engine warning light "Fuel Filter Blockage" flashed on, even though a new fuel filter had recently been installed. The "Check Engine" and "Service Engine Soon" warnings also flashed on. The driver pumped the breaks and coasted to the side of the road and the vehicle ceased operating entirely. The vehicle was then towed to Barlow Buick GMC at a cost of approximately $275. The Barlow technician diagnosed the vehicle as "crank no start" and "low fuel pressure while cranking," and told Tamburini the vehicle's current Bosch CP4 fuel pump had failed and that the vehicle would require a new one. The vehicle had 128,543 miles on it at the time.

23.     Tamburini then paid to have the vehicle towed to his residence. From January to March, 2018, he purchased original equipment manufacturer (OEM) and non-OEM parts from Barlow Diesel Power Service in Williamsport, PA and Xtreme Diesel Performance in North Wall Township, NJ, for a total cost of over $10,000, that enabled him to replace the defective Bosch CP4 fuel pump in his vehicle and fix the damage the defective fuel pump caused to his

vehicle's engine. He also rented a fuel tank polisher to clean out the fuel tank, which contained metal shavings that resulted from the failure of the Bosch CP4 fuel pump. Tamburini lost the use of this truck, with corresponding loss of business revenue, for about 60 days, when damage due to the defective Bosch CP4 pump was being repaired.

24.     At the time Tamburini purchased his 2015 GMC Sierra 2500 pickup truck, and in purchasing the vehicle, Tamburini relied on representations from GM and its authorized dealership that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Tamburini relied on these representations in purchasing the vehicle and, absent these representations, would not have purchased the vehicle and/or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, caused Tamburini to purchase the vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Tamburini, at the time of purchase, the 2015 GMC Sierra 2500 pickup truck contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, longevity and fuel efficiency of diesel that Tamburini relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Tamburini or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the GM Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Tamburini and each Class member suffered concrete economic injury as a direct and proximate result of GM's

wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects.

25.     In December of 2018, Tamburini traded in the vehicle, which had 158,725 miles on it at the time, for a new 2018 Dodge Ram 2500 pickup truck.

26.     Tamburini's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Accordingly, Tamburini brings claims individually and as a representative of the Class.

27.     Defendant General Motors LLC ("GM") is a Delaware limited liability company doing business throughout the United States and in various other countries and which does substantial business in New Jersey. GM is based in Detroit, Michigan.  The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business at 300 Renaissance CTR in Detroit, Michigan.  General Motor Holdings LLC's only member is General Motors Company, a Delaware corporation with its principal place of business in the State of Michigan. General Motors Company wholly owns General Motors Holdings LLC.

28.     At all relevant times, GM, through its various entities, manufactures, distributes, designs, sells, leases and warranties the Class Vehicles in this District and other locations in the United States.  Its core automobile brands include GMC and Chevrolet. GM and/or its affiliates and agents designed, manufactured and installed the engines systems in the Class Vehicles, which included the CP4 pump.  GM and/or its affiliates and agents also developed and

disseminated the owners' manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

## IV.    CLASS ACTION ALLEGATIONS

29.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> All persons or entities who purchased or leased a Class Vehicle in the State of New Jersey (the "Class").

30.    Excluded from the Class are individuals who have personal injury claims as a result of the facts herein.  Also excluded from the Class are GM and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family.  Plaintiffs reserve the right to revise the definition of the Class based upon information learned through discovery.

31.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

32.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

33.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  The members of the Class are so numerous and geographically dispersed that individual joinder is impracticable.  While Plaintiffs are informed and believe that there are not less than thousands of members in the Class, the precise number of Class members is unknown to Plaintiffs, but may be ascertained from GM's records.  Members of the Class may be notified of the pendency of this action by recognized,

Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

34.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)):** There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any questions affecting individual members of the Class including, without limitation:

(a)     Whether GM engaged in the conduct alleged herein;

(b)     Whether the CP4 injection pump is incompatible with diesel fuel sold in the United States;

(c)     Whether GM knew about the defect and, if so, how long GM has known;

(d)     Whether GM's conduct violates New Jersey consumer protection statutes, warranty laws, and other laws as asserted herein;

(e)     Whether Plaintiffs and the other members of the Class overpaid for their Class Vehicles;

(f)     Whether Plaintiffs and the other members of the Class are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

(g)     Whether Plaintiffs and the other members of the Class are entitled to damages and other monetary relief and, if so, in what amount.

35.     **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through GM's wrongful conduct as described above.

36.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):**  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in

complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

37.     **Declaratory and Injunctive Relief (Fed. R. Civ. P. 23(b)(2)):**  GM has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

38.     **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  Absent a class action, most members of the Class would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Even if members of the Class could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## V.     STATUTES OF LIMITATION

39.     For the following reasons, any otherwise-applicable statutes of limitation have been tolled or are otherwise inapplicable with respect to all claims alleged in this Complaint.

### A.     Discovery Rule Tolling

40.     Within the time period of any applicable statutes of limitation, Plaintiffs and other members of the Class, through the exercise of reasonable diligence, could not have discovered that GM was concealing the defects in the Class Vehicles.

12

41.     Plaintiffs and the members of the Class could not reasonably discover, and did not know of facts that would have caused a reasonable person to suspect, that GM intentionally failed to report information within its knowledge to federal and state authorities, its dealerships, or consumers.

42.     Likewise, a reasonable and diligent investigation could not have disclosed that GM had information in its sole possession about the existence of its deception and that it concealed that information, which was discovered by Plaintiffs immediately before this action was filed.  Plaintiffs and other members of the Class could not have previously learned that GM valued profits over compliance with applicable federal and state consumer laws.

**B.     Fraudulent Concealment Tolling**

43.     Throughout the relevant time period, all applicable statutes of limitation have also been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

44.     Instead of disclosing the defects of which it was aware, GM falsely represented that its vehicles were safe and durable, and that it was a reputable manufacturer whose representations could be trusted.

**C.     Estoppel**

45.     GM was under a continuous duty to disclose to Plaintiffs and the other members of the Class the true character and quality of the Class Vehicles, including the CP4 pump failure and effects thereof.

46.      GM instead knowingly, affirmatively and actively concealed the foregoing facts.

47.     Based on the foregoing, GM is estopped from relying on any statutes of limitations or laches defense in this action.

## VI.    ADDITIONAL FACTUAL ALLEGATIONS

48.    Defendant manufactured and sold cars that it knew contained CP4 fuel pumps which were incompatible with American diesel fuel.  Defendant sold cars with these defective pumps, intentionally and knowingly hiding the truth about such defects.

### A.    Plaintiffs Paid a Premium for the Diesel Vehicles, Which were Falsely Touted for Their Durability by Defendant

49.    Defendant charges a premium for its diesel pickup trucks.  For example, a 2018 GM Sierra 2500 HD, with a gasoline engine has a net price of $43,195.  The same model, with the diesel engine, however, has an MSRP of $52,590.[1]

50.    Consumers are willing to pay such a premium for diesel pickup trucks in return for the durability and reliability of such vehicles, which are known to last hundreds of thousands of miles longer than gasoline pickup trucks.

51.    In fact, GM has always emphasized the quality, reliability and efficiency of the Class Vehicles and knows that consumers, including Plaintiffs and the Class, rely upon such factors when purchasing or leasing Class Vehicles. For example, the "2011 GMC Sierra heavy duty" brochure assures consumers that "when our engineers created the new 2011 Sierra Heavy Duty Series, they left no bolt unturned. By rejecting compromise and crafting every detail, GMC delivered the strongest, most powerful and most capable lineup of Sierra HD Pickups, ever. . . . GMC. We are professional grade."  The brochure extols its virtues and assures consumers specifically that "[t]he available new Duramax diesel 6.6L V-8 Turbo … [is] engineered to achieve a goal that most assumed to be impossible: improving power and mileage, together. Advanced diesel direct-injection technology and an adaptive transmission controller help Duramax to run at peak efficiency, and provide you with a highway mileage range of up to 680

---

[1] https://www.gmc.com/previous-year/sierra-2500hd-pickup-truck/build-and-price/config

highway miles."  The brochure also states that "Sierra offers the best coverage in America . . . with GM's 5-Year/100,000-Miles Transferable Powertrain Limited Warranty."[2]

52.     Unfortunately for consumers who bought Defendant's vehicles with CP4 fuel injection pumps, such pumps were defective, causing Plaintiffs and Class members to not only pay more than such trucks were worth, but causing consumers to often spend thousands of dollars in repair costs and/or repair kits, which were ineffective remedies at best.

**B.     The Defective CP4 Fuel Injection Pumps**

53.     GM introduced its Duramax engine – designed in partnership with Isuzu – in its 2001 model diesel vehicles.  This engine – the 6.6L LB7 Duramax –contained a Bosch CP3 fuel injection pump.

54.     After redesigns in 2004, 2006 and 2007, the Duramax was remodeled again for its 2011 model year.  This engine – the 6.6 LML Duramax – replaced the Bosch CP3 fuel injection pump with a Bosch CP4 fuel injection pump.

55.     The fuel injection pump is an essential part of the diesel engine.  Diesel engines – like gasoline engines – convert fuel into energy through a series of small explosions or combustions.  In general, a diesel fuel system injects precise amounts of pressurized diesel fuel at specific times.  When the fuel mixes with hot compressed air combustion occurs.  Immense amounts of pressure are needed to compress diesel fuel.  The diesel high-pressure injection pump is responsible for compressing the diesel fuel in preparation for injection into the combustion chamber.

---

[2] http://www.auto-brochures.com/makes/GMC/Sierra/GMC_US%20SierraHD_2011.pdf (last visited on March 14, 2019.)

56.     The CP4 fuel injection pump – the successor to the CP3 fuel injector pump, which was known for its reliability – creates higher pressure with less volume, thus providing a more efficient pump but with less lubrication.

57.     Lubricity – the ability of a fluid to minimize the degree of friction between surfaces in relative motion under load conditions – is critical because if lubricity is not at a satisfactory level, then internal engine components including the fuel pump are prone to excessive wear causing them to fail.

58.     The CP4 relies on diesel fuel to maintain lubrication.  While the CP4 has been used in Europe for many years without trouble, fuel in the United States has less lubricity than in Europe due to regulations by the Environmental Protection Agency ("EPA").  Specifically, beginning in the mid-2000s the EPA began phasing in ultra-low sulfur diesel ("ULSD") in order to reduce harmful emissions.  After 2010, the EPA's standards required that all on road diesel fuel supplied to the market be ULSD and all on road diesel vehicles must use ULSD.

59.     The process of desulfurization results in less lubricity. During the desulfurization process via hydrotreating, hydrogen gas is introduced to the crude oil under extreme temperatures and pressures.  The hydrogen combines with the sulfur to form hydrogen sulfides that are then removed and converted into elemental sulfur for resale.  During desulfurization, critical compounds innate to the fuel and responsible for imparting significant lubricity quality, are destroyed under the intense operating conditions.  The resulting yield is the low sulfur diesel fuel, which is low in lubricity.

60.     In the mid-2000s, the EPA required that diesel fuel meet a minimum lubricity level of a maximum wear scar diameter or 520 microns based on the standards propounded by the American Society for Testing and Materials ("ASTM") D-975.  However, the Bosch CP4

16

pump specifications allow for a maximum 460 wear scar.  The CP4 pump was clearly out of specification.

61.     The combination of low volume of fuel and low lubricity of fuel – problems of which GM was well aware, as detailed below, causes the CP4 pump to fail, sending metal shavings throughout the fuel system and often requiring replacement of all of the fuel system components, including the CP4 pump, fuel injectors, injection lines, and fuel rails.  Additionally, such catastrophic failure often causes the vehicle to stall.

62.     An article published in December 2017 by Diesel Tech magazine, entitled "Common Problems: The CP4 Time Bomb," aptly explained both the problem and some costly remedies as follows:

> To kick things off, we're going to look at something that's very near and dear to our hearts: the CP4 injection pump on 2011-present LML Duramax engines. Boy, where to begin? People have taken a somewhat hyperbolic approach and refer to the CP4 as a time bomb, among other colorful terms. The thing is, they're not too far from the truth. Even if you have a 100 percent stock pickup, there's a [really] good chance that you're going to be on the receiving end of a $10,000 bill when it finally goes out on you and destroys your entire fuel system.
>
> So what's going on here? Well, as with most things, the blame lies in the fact that the CP4 replaced the old reliable CP3 as a cost-saving measure. See, the newer model trucks have more efficient piezoelectric injectors, which means they require less fuel to run properly. Sounds good, right? The problem is that with less fuel volume comes less lubrication of the components in the pump. Adding to the trouble is the fact that the ultra low-sulfur diesel we have in the US has less lubricity than elsewhere in the world.
>
> Another contributing factor is that stock Duramax engines don't have lift pumps. Lift pumps help supply fuel directly to the injection pump, which then sends it on to the engine. This decreases the amount of work the injection pump has to do, which obviously leads to longer pump life. All that is a long way of saying that the injection pumps on Chevys have to do all the work with worse lubrication. Even a CP3 pump will have a hard time providing the necessary fueling without a little extra help. Without a lift pump, the fuel is under constant suction, which causes undue wear and tear on the pump and the injectors, as well as cavitation. Quick side note: besides being a word that my word processor doesn't recognize,

17

cavitation is defined as the formation of empty space within a liquid because of a propeller. In layman's terms, it means air bubbles that show up because of the speed of the fan. It shows up more commonly with boats, where the propeller is the means of propulsion, but the same concept applies to any kind of fan-driven pump.

Add all these things up and it's literally just a matter of time until your CP4 pump fails. As I said before, it can be catastrophic when this happens, because not only will it destroy the injectors, but it will leave metal shavings in your fuel lines (which is impossible to fix without replacing the entire system) and can even in rare cases crack the gear and throw it through the engine's front timing cover. . . .

The most popular way to address this issue is to simply replace the CP4 with a CP3. Many companies, such as Fleece, BD Diesel, and Dynomite Diesel offer replacement kits that come with everything you need to change out the offending CP4 with a stronger, more reliable CP3. Some companies even offer the solution of a dual fueler kit, which is simply a CP3 that sits alongside the CP4 to help out with pumping duties. This is more popular with Power Strokes, though, so it may not work as well with a Duramax.

Price is obviously an issue for all this, and the cost is going to fluctuate based on how serious you get. As stated, simply adding fuel additives is the cheapest option, with prices ranging from around four dollars for an eight-ounce bottle up to 50 bucks for a gallon. Once you start adding components to the engine, prices go up considerably. CP3 conversion kits will run you anywhere from $600-$3000, depending on whether the kit actually includes the pump. Dual pump kits range between $2000-$3000, depending on whether you want a stock pump or a modified one. Lift kits are comparatively cheap, coming in around $600-$800.[3]

63.     Defendant offered Bumper-to-Bumper warranty coverage for Class Vehicles for 3 year/36,000 miles and a Powertrain warranty for engine parts for 5 year/100,000 miles for HD pickups equipped with a 6.6L Duramax engine.  These warranties cover the parts at issue.

64.     GM's warranties purport to "cover repairs to correct any vehicle defects," at no charge.  Buyers, lessees, and other owners of the Class Vehicles were without access to the information concealed by GM as described herein, and therefore reasonably relied on

---

[3] Common Problems: The CP4 Time Bomb available at
https://www.dieseltechmag.com/2017/12/common-problems-the-cp4-time (last visited on March 14, 2019.)

Defendant's representations and warranties regarding the quality, durability, and other material characteristics of their vehicles. Had these buyers and lessees known of the defect and the potential danger, they would have taken steps to avoid that danger and/or would have paid less for their vehicles than the amounts they actually paid, or would not have purchased their vehicles.

65.     Defendant has declined to extend warranty coverage and free repairs to those owners and lessees of the Class Vehicles who have, and have not yet, experienced failure of the CP4 pump.

66.     Car engines and component parts are designed to function for periods (and mileages) substantially in excess of those specified in GM's warranties, and given past experience, consumers legitimately expect to enjoy the use of an automobile without worry that the engine will catastrophically fail for significantly longer than the limited times and mileages identified in Defendant's warranties.

**B.     Defendant Had Knowledge Of and Concealed the Existence of Defective CP4 Fuel Injection Pumps in the Class Vehicles**

67.     GM has long been aware that the CP4 Fuel Injection Pumps would fail in vehicles used in the United States.

68.     The incompatibility of ULSD on high-pressure fuel pump injection systems are known within the automotive industry.  For example, the Truck & Engine Manufacturers' Association ("EMA"), of which GM is a member, put out a Position Statement, on April 22, 2002, titled: "EMA Consensus Position Pump Grade Specification," which stated:

> Lubricity describes the ability of a fluid to minimize friction between, and damage to, surfaces relative to motion under loaded conditions. Diesel fuel injection equipment relies on the lubricating properties of fuel. Shortened life of engine components such as fuel injection pumps and unit injectors can usually be attributed to lack of fuel lubricity and, hence, lubricity is of concern to engine manufacturers. This property is not addressed adequately by ASTM D 975.

19

69.     On August 8, 2005, the EMA put out a position paper titled: "North American Ultra Low Sulfur Diesel Fuel Properties," which stated:

> Regardless of the fuel sulfur level, ASTM D975 currently requires lubricity specified as a maximum wear scar diameter of 520 micrometers using the HFRR test method (ASTM D6079) at a temperature of 60°C. Based on testing conducted on ULSD fuels, however, fuel injection equipment manufacturers have required that USLD fuels have a maximum wear scar of 460 micrometers. EMA recommends that the lubricity specification be consistent with the fuel injection equipment manufacturers' recommendation.

70.     Thus, GM was well aware that the CP4 pump was inappropriate for diesel vehicles in the U.S. The CP4 Pump specifications for fuel lubricity allow for a maximum of 460 wear scar. Therefore, by definition the 520 wear scar specification of American diesel is inadequate to lubricate the Pump.  .

71.     GM would also have been aware of documentation regarding widespread CP4 failures and its adverse effects provided to the National Highway Traffic Safety Administration ("NHTSA") by Bosch, Audi, and Volkswagen regarding the NHTSA's Office of Defect Investigations Inquiry No. INRD-EA11003 in late 2011 through early 2012.  The documentation includes, for example, an March 7, 2011 Bosch Submission to NHTSA, in a document entitled "IND-EA11003-59347P.pdf," that states Audi sent Bosch a failed CP4 fuel pump in 2009 for analysis after "[t]he high pressure fuel pump failed catastrophically shedding metal shavings throughout the entire fuel system . . . This car will require a complete new fuel system from tank to injectors and everything in between. This will be a very lengthy repair (weeks) . . . We need to determine if component failure or bad fuel is to blame."   Similarly, the March 7, 2011 submission contained a June 9 email from Volkswagen to Bosch stating: "I have here a pump

from [sic] a 2.0 TDI.  I have been testing a lot of these this week and many have an amount of 'metal Debris' or other metallic particles in them."

72.     A July 27, 2012 Bosch submission, in a document entitled, "INRD-EA11003-59345P.pdf," which includes a September 15, 2011 email from Volkswagen to Bosch regarding: "080211_Status_CP4.1_Bosch," in which a Volkswagen representative sent a formal "change request in [the] form of exemplary documents on failures of high-pressure diesel pump Bosch CP4. I think the failures are well known. It is also important to know that not only the high-pressure fuel pump, but the entire injection system is to be replaced in case of damage to a HPP with a cost [REDACTED] caused by chip contamination").

73.     GM provided NHTSA with its response to the NHTSA's request for peer vehicle information from GM as part of NHTSA's investigation into complaints of high pressure fuel pump failure resulting in engine stall in certain Volkswagen and Audi vehicles.  GM's response dated – December 9, 2011 – was sufficient to show a problem involving CP4 high pressure fuel pump beginning in GM's 2011 models.  For example, GM stated that in the second quarter of 2011, it knew of at least 99 field reports of CP4 high pressure fuel pump failure in the 2011 Chevrolet Silverado, of which 30 were stalls.[4]

74.     Federal law also requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosures of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

---

[4] Dec. 9, 2011 letter from GM available at https://static.nhtsa.gov/odi/inv/2011/INRL-EA11003-50067P.pdf (last visited on March 11, 2019).

75.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id*. Thus, GM knew or should have known of the complaint about the faulty CP4 pump logged by NHTSA's Office of Defects investigation ("ODI"), and the complaints alerted, or should have alerted, GM to the defect. All automobile manufacturers routinely monitor and analyze NHTSA complaints because this information is used in determining if a recall should be issued. *See* https://www-odi.nhtsa.dot.gov/recalls/recallprocess.cfm (last visited Feb. 13, 2019).

76.     The following complaints made to NHTSA demonstrate that the defect is widespread.  The complaints also indicate GM's awareness of the problems with the CP4 pump, including how dangerous they can be.

> June 27, 2014 – 2012 GMC Sierra 3500 - DRIVING FROM GM DEALER FOR TWO MILES CHANGE FUEL FILTER MESSAGE APPEARED AND ENGINE DIED. TOWED TO A DEALER DIAGNOSED AS A HIGH PRESSURE INJECTOR PUMP FAILURE WITH METAL CONTAMINATION TO FUEL SYSTEM. I HAVE FOUND A BULLETIN DATED 2009 FROM EQUIPMENT MANUFACTURERS. THIS JOINT STATEMENT HAS INFORMATION ABOUT THE FUEL USED IN THE USA THAT I WAS NOT AWARE OF AND MAY HAVE AVOIDED THIS FAILURE. THIS IS A VERY EXPENSIVE REPAIR AS I USE MY TRUCK FOR WORK. *TR NHTSA ID 10607796
>
> August 2, 2015 – 2013 Chevrolet Silverado 2500 - ON AUG 2, 2015 ABOUT 25 MILES EAST OF GRAND JUNCTION CO. DRIVING SPEED WAS ABOUT 65 MPH ON INTERSTAE I-70. MY CHEVY SILVERADO 2500 WENT INTO A COMPUTER SHUT DOWN.BEING A SKILLED PROFESSIONAL DRIVER , WITH A CLASS A CDL I JUST MADE IT TO THE SHOULDER BEFORE TRUCK SHUR DOWN, TRUCK AND TRAVEL TRAILER I WAS TOWING NEEDED TO BE TOWED TO ED BOZARTH GM DEALER.ON MONDAY I WAS INFORMED WOULD NEED TO PAY $ 775 TO DETERMINE POINT OF FAILURE. AT THE TIME A COMPANY CALLED SPEEDCO WAS AND MAYBE SUSPECT AS TO CAUSE. THE DID A OIL CHANGE AND FUEL FILTER IN W. MEMPHIS AR. THIS SERVICE WAS DONE ON JULY 24,2015.

22

ON JULY 25,2015 TRUCK NO START, SPEEDCO CAME OUT WITH
ANOTHER FUEL FILTER. WHEN FIRST FUEL FILTER TAKEN OFF , THERE
WERE NO GASKETS. HOWEVER GM APPEARS TO BE CONCELING
MATERIAL FACTS AS TO INTERNAL SERVICE BULLETINS. THIS
BULLETIN AS TO POINT FAILER WAS PRINTED AUG 3, 2015 , 5 PAGES . A
ESTIMATE BY SAID DEALER WAS GIVEN TO SPEEDCO AND MYSELF IN
THE AMOUNT OF $ 8,692.02. WHEN THE FUEL INJECTION PUMP WENT ,
SENT METAL SHAVINGS THOUGH MY WHOLE SYSTEM ENGINE, FUEL
OIL, COOLING SYSTEM ECT. GM HAS KNOW ABOUT THIS PROBLEM FOR
A LONG TIME, HOWEVER FAILED TO DISCLOSE TO ITS CUSTOMERS. IN
MY OPINION TO ALLOW FOR WARRANTY TO EXPIRE. ONCE SPEEDCO
WAS PRESENTED WITH SERVICE BULLETIN THEY BACKED DOWN FROM
PAYING. GM HAD PROVED TO SPEEDCO THAT GM IS THE PROBLEM. I
HAVE CONTACTED GM IN DETRIOIT MANY TIMES WITH DIFFERENT
CASE NUMBERS. ONE PHONE CALL I GOT FROM GM , STATED THE
ORIGINAL ESTIMATED STATED ABOVE WAS FAR LOW. WHEN I ASKED
HOW MUCH, STATED TO ME COULD NOT SAY HOWEVER MUCH HIGHER.
I'M IN POSSESSION OF A LOT OF DOCUMENTATION. I HAVN'T SCANED
THE DOCUMENTS YET. THIS TRUCK WAS PURCHASED IN OCT. OF 2013
FOR $ 56,000, BANK FINANCING. ALSO THIS TRUCK WAS PURCHASED TO
EARN A LIVING PULLING NEW TRAVEL TRAILERS. MY EXCELLENT
CREDIT IS ON THE LINE DUE TO THIS LEMOM. TRUCK HAD 20K, WITH
WARRANTY.

June 13, 2016 – 2012 Chevrolet Silverado 2500 – I WAS DRIVING DOWN A
HIGHWAY ROAD WHEN MY VEHICLE ABRUPTLY LOST POWER, I
RECEIVED A WARNING FROM MY DASHBOARD SAYING FUEL FILTER
NEEDS REPLACING AND SUBSEQUENTLY LOST ENGINE POWER WHICH
RESULTED IN NO POWER STEERING AND NO BRAKES. I WAS ABLE TO
KEEP THE VEHICLE UNDER CONTROL AND GOT IT TO THE SIDE OF THE
ROAD BEFORE IT BECAME DEAD. AFTER GETTING THE VEHICLE TOWED
TO A GARAGE IT WAS DETERMINED THAT THE CP4 FUEL INJECTION
PUMP HAD FAILED RESULTING IN FUEL BEING STARVED FROM THE
ENGINE AND THE RESULT WAS THE ENGINE SHUTTING OFF. THE
REPAIRS ALONE FOR THIS SINGLE FAILURE ARE $8550 BECAUSE THIS
PUMP HAS FOULED ALL THE FUEL INJECTORS AND REGULATORS IN
THE FUEL SYSTEM. MOST IMPORTANTLY THOUGH, I WAS FORTUNATE
ENOUGH TO BE IN A POSITION ON HIGHWAY WHERE I HAD NO TRAFFIC
BEHIND ME, AND ON A RELATIVELY STRAIGHT ROAD WHERE I WAS
ABLE TO GET TO THE CURB BEFORE IT BECOME A BIGGER PROBLEM.
FROM WHAT I HAVE FOUND THIS IS BECOMING A COMMON PROBLEM
ON ALL OF THE DURAMAX 6.6L LML ENGINES UTILIZING THIS TYPE OF
FUEL INJECTION PUMP AND GM NEEDS TO RECALL THESE SYSTEMS
AND REPAIR THEM. I DO NOT HAVE THE REPAIR INVOICE YET BECAUSE

THE VEHICLE IS STILL BEING REPAIRED BUT WILL BE HAPPY TO
SUPPLY IT WHEN I RECEIVE IT. NHTSA ID 10873931

March 15, 2017 – 2012 Chevrolet Silverado 3500
WHILE DRIVING ON A FOUR-LANE HIGHWAY TOWING OUR 15,500 LB
FIFTH WHEEL, SUDDENLY, WITHOUT ANY WARNING, WE HEARD
RATTLING, LOST POWER, AND THE ENGINE SHUT DOWN. THE NOISE
AND LOSS OF PROPULSION, POWER STEERING AND POWER BRAKES ALL
OCCURRED WITHIN ABOUT 2-3 SECONDS. GRATEFULLY, THE DRIVER
HAD THE FORTITUDE TO IMMEDIATELY BEGIN PULLING ONTO THE
SHOULDER OF THE SLIGHT DOWNWARD SLOPE ON WHICH WERE WERE
DRIVING. LUCKILY, WE WERE ON A STRETCH OF ROAD THAT WAS NOT
INCLINED, NOT IN A CONSTRUCTION ZONE WITH BARRIERS, NOT IN A
SNOWY MOUNTAIN PASS OR IN OTHER INCLEMENT WEATHER, NOT IN
THE LEFT LANE PASSING, ETC. HAD ANY OF THESE FACTORS
PREVENTED US FROM SIMPLY PULLING ONTO THE SHOULDER OF THE
ROAD, THE POTENTIAL FOR A LIFE THREATENING ACCIDENT WOULD
HAVE BEEN SIGNIFICANT.

THE CHEVROLET/GM SERVICE CENTER CONFIRMED THE BOSCH CP4
HPFP SUFFERED A CATASTROPHIC FAILURE, DESTROYING THE ENTIRE
FUEL SYSTEM OF THE TRUCK. GM IS COVERING PART OF THE REPAIR
COSTS (TRUCK IS AT 119,705 MILES), BUT OUR BILL WILL REMAIN
SUBSTANTIAL.

RESEARCH OF DIESEL, TDI, AND OTHER FORUMS DOCUMENT THIS
PROBLEM AS WELL-KNOWN AND BROADER THAN THE EXISTING 9
COMPLAINTS IN THE NHSTA PUBLIC DATABASE AND THE
INVESTIGATION OF VW/AUDI. SOME PEOPLE ARE EVEN REPORTING
MULTIPLE FAILURES. THE MOST COMMON BELIEVABLE CAUSE OF THE
FAILURES SEEMS TO BE A MISMATCH OF LUBRICITY SPECS BETWEEN
THE BOSCH CP4 AND THE DIESEL FUEL IN THE U.S.

PLEASE OPEN AN INVESTIGATION, AND ORDER GM, FORD, VW, BOSCH
AND OTHERS TO RECALL THESE VEHICLES TO PROVIDE THE
NECESSARY REPAIRS. ALSO PLEASE MANDATE, TO THE EXTENT
YOU'RE ABLE, REIMBURSEMENT TO THOSE OF US PAYING FOR REPAIRS
TODAY. I HAVE READ, BUT HAVE NOT BEEN ABLE TO CONFIRM, THAT
VW EXTENDED THE WARRANTY TO 120K MILES. THIS SEEMS LIKE A
MINIMUM (MORE IS BETTER) STEP, AND IT SHOULD BE RETROACTIVE. R
NHTSA ID 10966092


Sept. 11, 2017 – 2014 GMC Sierra 2500 - MY FUEL PUMP AND INJECTORS
FAILED WHILE I WAS DRIVING, STRANDING MY TRUCK IN THE MIDDLE

OF TRAFFIC RIGHT WHERE A CITY STREET WAS CHANGING TO A COUNTRY ROAD. THE GMC DEALERSHIP FALSELY CLAIMED THAT THIS WAS CAUSED BY USING UNAPPROVED FUEL. THE FUEL I USED WAS B20 BIODIESEL, WITH 80% RENEWABLE DIESEL, WHICH MEETS DIESEL SPECIFICATIONS AND IS A LEGAL ROAD FUEL IN CALIFORNIA. THEY ALSO CLAIMED THAT A CASCADE OF OTHER PROBLEMS WERE ALL CAUSED BY MY FUEL AND REFUSED TO APPLY MY WARRANTY. NHTSA ID 11045708

77.     Complaints concerning the CP4 fuel pumps can also be found on online forums. For example, on the "Duramax Forum.com," a complainant wrote on January 2015 re: "2015 Duramax Injection Pump Troubles," as follows: "I have a new 2015 GMC 3500 with 14k miles that the injection pump crapped out on me. Dealer has had it for 3 ½ weeks.  Was told if they find any metal they would have to tear the engine down. Well they found metal but didn't tear it all the way down. Has anyone else had an issue [with] the injection pump on the 2015 Duramax."  A forum member responded, "lots of LML's have had injector pump issues in the states go down to the LML [forum] and read, its caused by the new cp4.2 pump that needs better fuel then what you can buy."  Another forum member added "To bad the dealers wont just install a cp3 instead of the crappy cp4 when these go out in the lml's. It only makes sense!"[5]

78.     GM also issued bulletins to its dealers – not consumers – that also indicates its awareness of the problem.  In August 2014, GM issued a Service Bulletin entitled "Duramax Diesel Hard Start No Start P0087 P0088 P0191 P128E Or Injection Pump replacement," for vehicles with the 6.6L Duramax Diesel RPO codes LGH and LML, including, for the 2010-2015 GMC Sierra, which states that "a dealer may encounter a customer concern of a hard start or a no start," which may "lead to Fuel Injection Pump replacement," and if fuel injection pump

---

[5] "2015 DuraMax Injection pump Troubles," Duramax Forum.com available at https://www.duramaxforum.com/forum/general-discussion/560786-2015-duramax-injection-pump-troubles.html (last visited on March 11, 2019).

replacement is required than the "Fuel Pressure Regulator 1 must be inspected for magnetic metal debris.[6]"

79.    In March 2017, GM reissued the Preliminary Information as Technical Service Bulletin #16-NA-102 and added the 2016 model year.[7]

80.    Defendant was also aware of the defect through (1) their own records of customers' complaint, (2) dealership repair records, (3) warranty and post-warranty claims, (4) internal durability testing, and (5) other various sources.  Additionally, there are numerous independent kits provided by independent suppliers, which are designed to redirect the lubricating fuel for the CP4 back to the fuel tank, so it will be filtered before it returns to the engine.  GM would have been aware of such kits, which are only incomplete remedies.

81.    Had Plaintiffs and members of the Class known of the defect at the time they purchased or leased their Class Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.  Moreover, even if GM recalls the Class Vehicles and installs a different pump, Plaintiffs and members of the Class will not benefit from the performance qualities of their vehicles as advertised.

82.    GM's deliberate strategy to value profit over the truth and human health has caused – and continues to cause - serious harm to consumers nationwide.

## CAUSES OF ACTION

### COUNT I
### Violation of the New Jersey Consumer Fraud Act (N.J. Stat. Ann. §§ 56:8-1, et seq.)

---

[6] Service Bulletin 10044240-3551, "Duramax Diesel Hard Start No. Start P0087 P0088 P0191 P128E Or Injection Pump Replacement" available at https://static.nhtsa.gov/odi/tsbs/2014/SB-10044240-3551.pdf (last visited on March 11, 2019).

[7] #16-NA-102: Duramax Diesel Hard Start, No Start, DTCs P0087, P0088< P0191, P128E or Injection Pump Replacement available at https://f01.justanswer.com/Bluegorilla/53288260-1d95-4c61-94ef-9cbd4868f4c1_My_Boot_Camp_printed_document.pdf (last visited on March 14 2019).

83.     Plaintiffs incorporate by reference each and every allegation above as if fully restated here.

84.     Plaintiffs bring this claim on behalf of themselves and on behalf of the proposed Class.

85.     The New Jersey Consumer Fraud Act ("NJCFA") protects consumers against "[t]he act, the use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…" N.J. Stat. Ann. § 56:8-2.

86.     Plaintiffs and members of the Class are consumers who purchased and/or leased Vehicles for personal, family or household use.

87.     The Class Vehicles are "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c).

88.     In the course of its business, GM failed to disclose and actively concealed the dangerous risk of the defect in the Class Vehicles as described above and failed to disclose and actively concealed the defect as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Accordingly, GM has engaged in unfair and deceptive trade practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent to not sell them as

27

advertised in violation of N.J. Stat. Ann. § 56:8-2.2; and otherwise engaging in conduct likely to deceive in violation of N.J. Stat. Ann. § 56:8-2.

89.     GM's acts and practices, as described herein, offend established public policy because of the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because GM concealed the defective nature of the Class Vehicles from consumers.

90.     GM's actions as set forth above occurred in the conduct of trade or commerce.

91.      GM's conduct caused Plaintiffs and Class members to suffer an ascertainable loss. In addition to direct monetary losses, the Plaintiffs and Class members have suffered an ascertainable loss by receiving less than what was promised.

92.     The Plaintiffs and the other Class members were injured as a result of GM's conduct in that the Plaintiffs and the Class overpaid for their Class Vehicles and did not receive the benefit of their bargain, they incurred costs for repairs, and their Class Vehicles suffered a diminution in value.

93.     A causal relationship exists between GM's unlawful conduct and the ascertainable losses suffered by the Plaintiffs and the Class. Had the defect in the vehicles been disclosed, consumers would not have purchased them or would have paid less for the vehicles had they decided to purchase them.

94.     Pursuant to N.J. Stat. Ann. § 56:8-20, the Plaintiffs will serve the New Jersey Attorney General with a copy of this Complaint.

## COUNT II
## Breach of Express Warranty under N.J.S.A. § 12A-313

95.     Plaintiffs incorporate by reference each and every prior allegation above as if fully restated here.

96.     Plaintiffs bring this claim on behalf of themselves and on behalf of the proposed Class.

97.     GM is a "merchant" with respect to motor vehicles within the meaning of N.J.S.A. §12A:2-104(1).

98.     Defendant expressly warranted that the Class Vehicles were of high quality and, at a minimum, would actually work properly.  Defendant also expressly warranted, in the warranties described above, that it would repair, replace, or adjust all parts that malfunction or fail at no cost.

99.     Defendant breached this warranty by selling to Plaintiffs and the Class members the Class Vehicles with defects (i.e., incompatibility with U.S. diesel fuel/improper design specifications), which are not of high quality, and which are predisposed to fail prematurely and/or fail to function properly.

100.     As a result of Defendant's actions, Plaintiffs and the Class members have suffered economic damages including, but not limited to, costly repairs, loss of vehicle use, substantial loss in value and resale value of the vehicles, and other related damage.

101.     Defendant's attempts to disclaim or limit these express warranties *vis-à-vis* consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

29

102.    The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and members of the Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant.  As gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale and/or at the time of their first use and would fail well before their useful lives.

103.    Plaintiffs and the Class members have complied with all obligations and requirements under the vehicles' express warranties, or are otherwise excused from performance of said obligations and requirements.

104.    Defendant's warranties formed a basis of the bargain when Plaintiffs and members of the Class purchased or leased their Class Vehicles and Plaintiffs relied on GM's express warranties when purchasing their Class Vehicles.

105.    Plaintiffs notified GM of the breach within a reasonable time, and/or was not required to do so because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile.  GM also knew of the defect and yet chose to conceal it and to not comply with their warranty obligations.

**COUNT III**
**Breach of Implied Warranty under N.J.S.A. § 12A:2-314**

106.    Plaintiffs incorporate by reference each and every prior allegation above as if fully restated here.

107.    Plaintiffs bring this claim on behalf of themselves and on behalf of the proposed Class.

108.     Defendant GM is a "merchant" with respect to motor vehicles within the meaning of N.J.S.A. § 12A:2-104(1).

109.     A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased their Class Vehicles under N.J.S.A. § 12A:2-104(1).

110.     These vehicles, when sold and at all times thereafter, were not merchantable and were not fit for the ordinary purpose for which cars are used due to their incompatibility with  diesel fuel sold in the United States, which is the fuel intended to be used by GM.  The use of such fuel causes the failure of the CP4 fuel pump resulting in catastrophic failure of the CP4 pump and failure of other parts in the Class Vehicles.

111.     As a direct and proximate result of GM's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

112.     GM's attempt to disclaim or limited the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, Defendant's warranty limitation is unenforceable because Defendant knowingly sold a defective product without informing consumers about the defect.

113.     The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and member of the Class. Among other things, Plaintiffs and members of the Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between GM and Class members, and GM knew or should have known that the Vehicles were defective at the time of sale and would fail well before their useful lives.

31

114.    Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

115.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Plaintiffs and the Class.

## COUNT IV
### Violation of Magnuson - Moss Act
### (15 U.S.C. §§ 2301, *et seq.*)

116.    Plaintiffs incorporate by reference each and every prior allegation as if fully restated here.

117.    Plaintiffs bring this claim on behalf of themselves and on behalf of the proposed Class.

118.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1331.

119.    GM's Class Vehicles are a "consumer product," as that term is defined in 15 U.S.C. § 2301(1).

120.    Plaintiffs and members of the Class are "consumers," as that term is defined in 15 U.S.C. § 2301(3).

121.    GM is a "supplier" and "warrantor" as those terms are defined in 15 U.S.C. § 2301(4) and (5).

122.    15 U.S.C. § 2310(d) (1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

123.    GM provided Plaintiffs and members of the Class with "implied warranties," as that term is defined in 15 U.S.C. § 2301(7).

124.    GM's express warranties are warranties within the meaning of 15 U.S.C. § 2301(6).

125.    GM has breached these warranties as described in more detail above.  Without limitation, GM's Class Vehicles are equipped with defective CP4 fuel pumps that are incompatible with American diesel fuel, the intended and only reasonably available fuel, as described above, which resulted in the problems and failures also described above.

126.    By GM's conduct as described herein, including GM's knowledge of the defects inherent in the vehicles and its action, and inaction, in the face of the knowledge, GM has failed to comply with its obligations under its written and implied promises, warranties, and representations.

127.    Plaintiffs and members of the Class have had sufficient direct dealings with either GM or its agents (dealerships and technical support) to establish privity of contract between GM, on one hand, and Plaintiffs and each of the other Class members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

128.    Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Plaintiffs have already done so, and GM has failed, after numerous attempts, to cure the defects.  At the time of sale or lease of each Class Vehicle, GM knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless

33

failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

129.    In its capacity as a warrantor, and by the conduct described herein, any attempts by GM to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles are unconscionable and any such effort to disclaim, or otherwise limit, liability is null and void.

130.    Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the Class members have not re-accepted their Vehicles by retaining them.

131.    All jurisdictional prerequisites have been satisfied.

132.    Plaintiffs and the members of the Class seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

**COUNT V**
**Unjust Enrichment**
**(Common Law)**

133.    Plaintiffs incorporate by reference each and every prior and allegation as if fully restated here.

134.    Plaintiffs bring this claim on behalf of themselves and on behalf of the proposed Class.

34

135.     As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, Defendant charged a higher price for their vehicles than the vehicles' true value.

136.     Additionally, as a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, Plaintiffs and Members of the Class have vehicles that require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon GM.

137.     Defendant has retained the benefit of increased financial gains, and know of and appreciate this benefit.

138.     Defendant was and continues to be unjustly enriched at the expense of Plaintiffs and Class members due to the known defects in the Class Vehicles.

139.     Defendant should be required to disgorge this unjust enrichment.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against GM, as follows:

A.     Certification of the proposed Class, including appointment of Plaintiffs' undersigned counsel as Class Counsel;

B.     An order temporarily and permanently enjoining GM from continuing the unlawful, deceptive, fraudulent and unfair business practices alleged in this Complaint;

C.     Injunctive relief in the form of a recall or free replacement program;

D.     Costs, restitution, damages, including treble and punitive damages, and disgorgement in an amount to be determined at trial;

E.     An order requiring GM to pay both pre- and post-judgment interest on any amounts awarded;

F.      An award of costs and attorneys' fees; and

G.      Such other or further relief as may be appropriate.

## VIII.   **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand a jury trial for all claims and issues so triable.


Dated:  March 15, 2019                        Respectfully submitted,

                                              BERGER MONTAGUE PC


                                              _/s/ Russell D. Paul_____
                                              Russell D. Paul (NJ Bar # 037411989)
                                              Eric Lechtzin (NJ Bar # 011841992)
                                              Shoshana Savett
                                              1818 Market Street
                                              Suite 3600
                                              Philadelphia, PA  19103
                                              Tel: (215) 875-3000
                                              Fax: (215) 875-4604
                                              rpaul@bm.net
                                              elechtzin@bm.net
                                              stsavett@bm.net


                                              *Attorneys for Plaintiffs and the Proposed Classes*